**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 07-05062-11-CR-SW-ODS |
| ) | |
| DANIEL JEFFREY McCANN, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendant's Motion to Suppress, to which the government has responded.

Defendant asserts that evidence and statements seized as a result of a search of his residence should be suppressed. A suppression hearing was held before the undersigned on March 13, 2007. Defendant was represented by counsel, Stuart Huffman, and the government was represented by Assistant United States Attorney David Rush.

It is defendant's contention that law enforcement did not have reasonable suspicion or probable cause to enter into or attempt to search his residence, or probable cause to support the issuance of the search warrant, and that they unlawfully entered the home to secure it. He also asserts that the prosecuting attorney did not have authority, reasonable suspicion, or probable cause to inform the officers that they could secure the residence prior to the search warrant being obtained.

1

Defendant contends that officers in their affidavit and application for the search warrant improperly included materials allegedly seen in plain view on a coffee table, and that there was nothing to indicate that the confidential informant was reliable. He asserts that Judge Curless cannot be considered an impartial judicial officer because defendant had filed lawsuits against him and the county, seeking damages in excess of $60 million. Further, it is contended that he cannot be considered impartial because he set the bond in the same amount. Defendant asserts, additionally, that there were no exigent circumstances to allow the officers to enter and secure the residence. It is his further contention that Officer Hill either knowingly and intentionally, or with reckless disregard for the truth, included false statements in the search warrant application. He asks that all statements made and evidence obtained be suppressed.

The government contends that the affidavit in this case provided sufficient information to allow the Court to issue a search warrant. It is also contended that it was reasonable for the officers to believe that the destruction of evidence was likely to occur, which could be prevented by entering and securing the premises. Even assuming, however, that the warrantless entry was not justified, the government asserts that if the information contained in the affidavit that was obtained by that entry was excised from the affidavit, the remaining facts would still support a finding of probable cause. The government also asserts that the officers acted in good faith on what they believed to be a valid search warrant signed by a neutral magistrate. It is also contended that there is no evidence to support defendant's broad allegations that Officer Hill knowingly and intentionally or recklessly included false statements in the search warrant affidavit.

The government called Jason Hill of the Barton County Sheriff's Department as its first witness. He is assigned to the Community Narcotics Enforcement Team ["CNET"] Task Force. On

2

June 14, 2007, he participated in a search warrant at 151 Southeast 20th Lane, Lamar, Missouri, as part of a methamphetamine investigation. He had obtained information from a confidential informant ["CI"] that the CI had purchased methamphetamine from defendant in the past, and he owed defendant some money from previous drug dealings. These purchases had occurred at defendant's previous residence. He was residing at 151 Southeast 20th Lane in Lamar on June 14. Officer Hill's plan was to use the CI to purchase methamphetamine from defendant that evening. After that, he hoped to obtain a search warrant for the residence. Prior to this controlled buy, he drove by the residence and the CI confirmed that was where defendant resided. His name was on the mailbox as well. The officer had previously been by the residence and had observed defendant and his wife, Jamie McCann, there. He noted that Jamie McCann also went by the name Jamie Mort. Prior to this, Officer Hill had also received information from Sheriff Higgins that this is where defendant resided. At about 9:00 p.m., on June 14, the CI tried to call defendant's residence, and it took several tries to get through. The officer was present when the CI made the calls. Someone did answer the telephone, and when the CI got off the phone, he said, "they were tweaking." [Tr. 6]. From the officer's experience, this meant that someone was high on methamphetamine, which would mean they are paranoid, and not sure what they are going to do next. They waited and called back in a few minutes. Then they sent the CI to the house. Surveillance teams were set up to watch the house. He pulled in the driveway, and went to the front door of the house, but no transaction took place. The CI then drove back to the rendezvous point where the officers were. They debriefed the CI, who told the officers that he talked to Jamie through the front door. She said to come back later. He also heard other people inside the residence. They observed one working vehicle at the residence. At about 10:30 p.m., they called the residence again,

and when the informant got off the phone, he indicated that "we're good to go down." [Tr. 9]. The CI went back to the residence, met an individual in the street in front of the residence, and purchased the methamphetamine. He then drove back to the rendezvous point, and handed the baggie to the officers. It field-tested positive for methamphetamine. The CI said he bought the methamphetamine from defendant. He also handed over a recording device. At this time, Officer Hill was not aware of a traffic stop that was occurring in the city of Lamar. After the purchase was completed, he called Agent Shayne Simmons, who said he had a traffic stop at Casey's Convenience Store in Lamar, which was about 1 ½ miles from defendant's residence. Officer Hill went to that location, and saw that the vehicle was the one that had been at defendant's house earlier. The other officers advised him that they'd arrested the driver for possession of methamphetamine. Agent Simmons said that they saw pipes, baggies, and other paraphernalia in the vehicle, including one baggie with a red decoration on it. The occupants of the vehicle said they were at the convenience store to buy soda, and they were going to return to the residence. He and the other officers were worried about the destruction of evidence because they'd just made a controlled buy, plus the traffic stop involved a vehicle that had left the residence, whose occupants had the intent of returning. The occupants were arrested and booked into the Barton County Jail. Also, they were concerned about the individuals at the residence who were high on methamphetamine. He was worried about the destruction of evidence because the residence was on a main road in a small town where word travels fast. He later learned that there was a phone inside the stopped vehicle.

Sheriff Higgins then contacted the Barton County Prosecuting Attorney to fill him in and talk to him about securing the residence pending their obtaining a search warrant. At about 11:00 p.m., they went back to the residence to secure the premises. When Officer Hill arrived, he saw Sheriff

4

Higgins and Agent Simmons meet defendant in the middle of the yard, and talk for a little while. As Officer Hill approached, he heard defendant yell, "Search warrant, run, baby," or words to that effect [Tr. 14]. Agent Simmons told him to secure the residence, and at that point, Jamie McCann stepped outside and yelled "What?" at the threshold of the door. [Tr. 15]. They secured her, and then made sure that nobody else was in the residence. The officers conducted a protective sweep to secure the residence, which was a small, one-story dwelling. The sweep took about 6-7 seconds. He saw a baggie with a red decoration on the coffee table in plain view. He noticed it because he had just seen one at the car stop. He also thought he saw a small bag of pills. After an "all clear" was given, Sheriff Higgins told him to start typing up the search warrant. [Tr. 16].

Judge Charles Curless read and signed the search warrant. The judge made no comments about the warrant, and made no mention of his knowledge of defendant. He gave no indication that he was not a neutral magistrate. When they executed the search warrant, they found methamphetamine, some currency, firearms, and paraphernalia associated with illegal substances. This was early in the morning of June 15. At the time the initial encounter was made with defendant and his wife, and the property secured, they were not placed under arrest. Later on June 15, Officer Hill made a probable cause statement, but was not involved in the arrest of defendant.

On August 17, 2007, the officer saw defendant at the Barton County Jail. He read him his Miranda rights, which he waved, and the officer interviewed him. Defendant told Officer Hill he'd been using methamphetamine for eight years. At this time, Officer Hill had been investigating Michael Wilson and his organization, which operated in Barton and Vernon counties. When asked, defendant said that Wilson and Harold Foster tell him everything. On the same day, he interviewed Jamie Mort and interviewed her again on August 20th.

5

On cross examination, the officer testified that he'd worked for the county about a year and was aware of defendant's history with the county. Prior to setting up surveillance on this occasion, the sheriff made him aware of the ongoing investigation of defendant for suspected drug activity. The sheriff also told him about one civil suit defendant had brought against the county. He was made aware that the suit was for $60-66 million dollars. The suit involved Sheriff Higgins and Judge Curless.

Regarding the CI, he was arrested on a drug charge and as part of a deal, he agreed to cooperate with authorities. He received a benefit for this, and was never charged with a crime. The officer wasn't involved with that decision. He'd never worked with the CI before. He did not remember when he first had contact with the CI, and admitted that this was his first buy with this CI. Prior to this case with defendant, he had had the opportunity to verify the reliability of the CI on one other occasion. He doesn't recall when it was, however. He deemed him reliable or credible through his interviews with him. In his affidavit, he does not mention any history with this CI. Therefore, he agreed that the judge wouldn't have information from the affidavit about the reliability or credibility of the CI. In regards to the verification about this particular incident, this included driving by the house and confirming that it was defendant's residence. Also, he saw the mailbox and Sheriff Higgins said it was defendant's residence, plus, they'd seen him there. The officer agreed that they did not have enough before the buy to get a search warrant. The CI's information regarding prior buys was a few weeks outdated. The officers had visual surveillance of the residence, and on the night of the buy, had audio surveillance through a recorder on the CI. That recording actually started when he went down to purchase methamphetamine, both on the first and second attempts. The CI was searched through a pat down, had the audio recorder installed, and was

6

given money to purchase the drugs. Officer Hill testified that it was Jamie Mort who answered the phone the first time, and she appeared to be tweaking when the CI first called. It was also Jamie who came to the door the first time and said to come back later. The CI did not mention specifically that defendant was tweaking, but when the officer encountered defendant, he appeared to be under the influence of methamphetamine. When the purchase occurred, the officer could not see defendant clearly, and could not see the transaction, which occurred in the middle of the road. He later heard defendant's voice on the audio recording, and the CI also confirmed that it was defendant conducting the transaction. They thought they had enough to secure the residence after the buy, but called the county prosecutor for a second opinion. Sheriff Higgins and Agent Simmons were the ones who initially approached the house to secure the residence. He believed that defendant came out of the house to approach them. He was present when Jamie Mort came out on the porch. Neither one was placed under arrest, even though he thought there had been a hand-to-hand buy. He just performed the protective sweep. He saw a plastic bag with a similar red decoration that he had seen on the baggie during the car stop. He did not look closely enough to check for residue. He also saw some pills in a small bag. He didn't seize anything because they were securing the residence and no one was going to be going in or out. He did not interview the occupants of the vehicle that had been stopped. Regarding defendant's history of suing the county, Officer Hill only knew that Judge Curless had been sued once by defendant, and the judge didn't mention their history. It was the sheriff who told him about the lawsuit.

  The second witness for the government was Officer Shayne Simmons of the Greene County Sheriff's Department, assigned to CNET. He participated in the investigation of defendant on June 14, 2007. Initially, he went along on the controlled buy to help with surveillance. He was part of

7

the debriefing of the CI after the first attempt to buy. The CI told him that one of his ex-girlfriend's vehicles was in the driveway at defendant's residence, and he could hear her talking inside the house. The CI thought they wouldn't let him in because of the chance of a confrontation with the ex-girlfriend. They were positioned north of the property, and during the period of 9:30 to 10:20 P.M., he observed several vehicles that had been there for several days. The one the CI had described was a white Ford truck. At approximately 10:20, they saw the truck leave, and he and Sheriff Higgins pulled out and followed it. The vehicle failed to signal when it pulled into Casey's, so they stopped the vehicle. A female driver appeared to be on the phone. The sheriff made contact with the driver, Adrian Gire, the CI's ex-girlfriend, and Officer Simmons approached the passenger. He recognized the occupants. The sheriff asked for consent to search the vehicle, which the driver, Ms. Gire, gave. Officer Simmons made the passenger, John McDowell, whom he knew to be on probation, exit the vehicle for safety reasons. During a pat down, he found steel knuckles in his pocket, and a pill bottle containing numerous baggies, which field tested positive for methamphetamine. When they first stopped the vehicle, the sheriff asked Ms. Gire where she was coming from, and she said a house down by the lake, which was defendant's residence. She indicated they had just come to the convenience store for some sodas, and were planning to return to the residence. After he searched the vehicle, and located nothing, he searched her purse, in which he located a snort straw and a small zip lock baggie with a substance that tested positive in the field for methamphetamine. The bag had a red design on it. The occupants were arrested and taken to the Barton County Sheriff's Department. The phone rang while they were stopped, on three separate occasions, and he wouldn't let her answer it. He'd called Officer Hill about the stop, and Officer Hill told him what had happened at the residence. He also believed the destruction of evidence was

8

likely to occur if they didn't secure the residence. He and Sheriff Higgins went back to the house to do that, and defendant met them in the middle of the yard. He asked what was going on, and they told him they were going to seize the property. That's when he yelled to his wife about a search warrant and to run. Then Jamie came out the door, and said she couldn't hear him. The officers talked to both of them, but did not arrest either one. Defendant was becoming hostile, and wanted to go back in the house. Officer Simmons told Officer Hill to do a sweep of the premises, and he confirmed that no one else was there. Defendant became more hostile. He asked to let the dog in, and when they let him, he locked the door. He kept asking if they were under arrest, and the officers told them that they were not. They were allowed to leave. Officer Simmons testified, that based on his experience and training, both defendant and his wife appeared to be under the influence of a controlled substance, particularly defendant.

Regarding when the warrant was signed, Judge Curless initially wrote a bond amount for $1 million dollars. That is a typical bond for drug distribution in Barton County, based on his experience. The Sheriff reminded the judge of who defendant was, and the fact that he had sued the judge. Then, Judge Curless asked for the warrant back and raised the bond to $66 million, saying, "This might bring back a memory for him." [Tr. 56].

On cross examination, the witness stated that he knew that defendant had sued everyone in the county. He admitted that the only traffic violation committed by the vehicle was a failure to signal when it turned into the convenience store. Although he observed the driver on the phone, he did not know to whom the calls were being made. It was implied that the occupants of the vehicle were going to return to defendant's residence because they said they just came to the store to get sodas, and the house was close by. He had no evidence that anyone was attempting to flee, and

9

agreed that defendant hands when they approached, and did not try to run. He did keep insisting that he was going to go back in the house. The officer told him he could not go back inside, although he was free to leave. The officer told him why they were seizing the property. Defendant was quite loud. Officer Simmons agreed that no one ran, but observed that there were several officers standing there. He agreed that it was his understanding that the judge changed the bond amount on the warrant to $66 million as a result of the fact that he had been previously sued for an amount similar to that.

The third witness for the government was Sheriff Shannon Higgins from Barton County. He was conducting surveillance on the night in question at defendant's residence, and followed the vehicle they saw leaving the residence to a convenience store. He and Officer Simmons pulled the vehicle over for a traffic infraction. He talked to Adrian Gire, who was driving the vehicle. She said they'd come from defendant's residence, were getting something to drink, and were going to return to the residence. The vehicle was searched, and Officer Simmons seized the items found. They discussed what had transpired with Officer Hill, and concluded that it was their belief that the destruction of evidence was likely to occur. He contacted the prosecutor to make sure he was aware of the situation, and make sure he didn't have any issue with them applying for the search warrant. After arresting the driver and passenger, and having them transported to the jail, they went back to the residence. He agreed with the testimony of the other officers regarding defendant's demeanor, and the fact that he and his wife appeared to be under the influence of a controlled substance.

Sheriff Higgins testified that the search warrant was obtained and the residence was searched in the early morning hours of the 15th of June. He was present when the arrest warrant was obtained, which was about 4:00 that afternoon. The initial bond amount was $1 million, which is a fairly
10

Case 3:07-cr-05062-ODS   Document 196   Filed 04/03/08   Page 10 of 18

common bond in that area. Defendant's lawsuit was brought up; the judge had the clerk bring the warrant back and increased the bond. On about June 18, 2007, he had contact with defendant, who called him on the phone. It was unsolicited. Defendant asked him a few minor questions and said what they found in the house was his, not Jamie's, and that she had nothing to do with it. Regarding the warrant for his arrest, they talked about it, and defendant indicated that he was willing to cooperate. The sheriff told him that he needed to be careful. Defendant wanted to make a deal for Jamie to not be charged, and to try to reduce his charges. He called back later that afternoon, and they discussed the nature of the information that he would have to provide, according to the prosecutor, to help his case. Defendant never turned himself in, and was subsequently arrested in Texas.

On cross examination, the witness acknowledged that defendant and Barton County have a long history. He knows he's been sued twice by defendant. Judge Curless, the prosecutor, and other officials were also sued. He agreed that neither defendant nor his wife tried to destroy evidence while they were at the residence, and they were not placed under arrest at that time, even though a hand-to-hand drug buy had occurred. The sheriff acknowledged that when defendant called him, he was aware there were pending charges against him, but he did not advise him of his <u>Miranda</u> rights. Regarding the bond increase, he believed the judge wanted to make a statement by using the same number as the amount for which defendant had sued him.

Defendant called Jamie McCann to testify on his behalf. She has been married to defendant for two years. On the day in question, she was contacted by someone who wanted to purchase methamphetamine. She hung up on him when he called because she doesn't like him. When he came to the door, she spoke to him through the door, telling him to leave. She did not tell him to

11

common bond in that area. Defendant's lawsuit was brought up; the judge had the clerk bring the warrant back and increased the bond. On about June 18, 2007, he had contact with defendant, who called him on the phone. It was unsolicited. Defendant asked him a few minor questions and said what they found in the house was his, not Jamie's, and that she had nothing to do with it. Regarding the warrant for his arrest, they talked about it, and defendant indicated that he was willing to cooperate. The sheriff told him that he needed to be careful. Defendant wanted to make a deal for Jamie to not be charged, and to try to reduce his charges. He called back later that afternoon, and they discussed the nature of the information that he would have to provide, according to the prosecutor, to help his case. Defendant never turned himself in, and was subsequently arrested in Texas.

On cross examination, the witness acknowledged that defendant and Barton County have a long history. He knows he's been sued twice by defendant. Judge Curless, the prosecutor, and other officials were also sued. He agreed that neither defendant nor his wife tried to destroy evidence while they were at the residence, and they were not placed under arrest at that time, even though a hand-to-hand drug buy had occurred. The sheriff acknowledged that when defendant called him, he was aware there were pending charges against him, but he did not advise him of his <u>Miranda</u> rights. Regarding the bond increase, he believed the judge wanted to make a statement by using the same number as the amount for which defendant had sued him.

Defendant called Jamie McCann to testify on his behalf. She has been married to defendant for two years. On the day in question, she was contacted by someone who wanted to purchase methamphetamine. She hung up on him when he called because she doesn't like him. When he came to the door, she spoke to him through the door, telling him to leave. She did not tell him to

come back, nor imply that he should come back. She told defendant who it was when he asked. She doesn't know what he wanted because she didn't give him time to tell her what he wanted. Their vehicle was broken down, and she asked a friend to give her ride to Wal-Mart. This was Adrian Gire. They picked her up, staying long enough for her to get her shoes on. When they brought her back, they didn't get out of the car. They didn't talk about coming back to the house. She didn't receive any phone calls from them and didn't call them. After they left, she was on the computer, and the dog starting barking, so defendant went outside to check on him. Ms. McCann is on probation for marijuana sales. She stayed on the computer while defendant went outside, so she finally looked out the window and saw something that looked like a confrontation outside; there was someone standing next to her husband and someone with his hand on defendant's chest. She didn't know initially that they were law enforcement. She did not hear her husband make any statements or yell anything to her. Some of the officers went inside the house while she was present, for a few minutes. They didn't say anything to her when they came out. She had told them to leave, but they went inside anyway. One was trying to pick a fight with her husband; they were yelling and screaming. She didn't know who they were. They were not arrested, even though they were detained there. She kept asking if they were under arrest, and was told they weren't. She heard the officers talking about getting a search warrant, and that they were going to stay there until they got it. She told them they needed to get off the property. She didn't think her husband was acting inappropriately, given that the person was poking him in the chest.

On cross examination, Ms. McCann stated that she was interviewed at some point by Officers Hill and Cambidi, where defendant was present. She later asked to speak to Officer Hill and told him that defendant had been using meth for five days prior to the raid on their house, and

12

that she had been as well. On August 20, she spoke with Officer Hill and Agent Henry, and said that Mike Wilson had delivered two pounds of methamphetamine to their house on the day in question. She said she was told by defendant to tell them anything they wanted to hear so she could get her daughter back.

The law is clear that a warrant is supported by probable cause if, "given all the circumstances set forth in the affidavit . . ., including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that contraband or evidence of a crime will be found in the place to be searched. United States v. Edmiston, 46 F.3d 786, 789 (8th Cir. 1995), quoting Gates, 462 U.S. at 238. Affidavits should be read in a "common-sense and realistic fashion" and judges must make a practical decision based on the totality of the circumstances. United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995) (citation omitted). In determining for suppression purposes the validity of a warrant, the court must determine whether there was a "substantial basis" for the probable cause determination. Gates, 462 U.S. at 238. Probable cause may be based on hearsay from a reliable source, and anonymous information that can be independently corroborated may form a probable cause basis. Id. at 244-45. "The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence." United States v. Etheridge, 165 F.3d 655, 657 (8th Cir. 1999).

Pursuant to Franks v. Delaware, 438 U.S. 154 (1978), in a challenge to a search warrant application, defendants must establish "that a false statement was included in the affidavit knowingly and intentionally or with reckless disregard for its truth, and that the affidavit's remaining content is insufficient to establish probable cause." United States v. Roberson, 439 F.3d 934, 939

13

(8th Cir. 2006). Even if the contested statements are false and misleading, the search warrant may still stand if the statements in question are removed and the remaining statements in the application would support a finding of probable cause to support the search warrant. Id. at 939.

Having fully reviewed the testimony at the hearing, the arguments of the parties, and the relevant case law, the Court finds that the affidavit in this case was adequate to support a determination of probable cause, despite defendant's assertions to the contrary. Officer Hill's testimony at the suppression hearing detailed the hand-to-hand buy that occurred on June 14 at defendant's residence. While it is true that the officer did not have a past working history with the CI to establish his credibility and reliability, he testified that he had had one prior opportunity to verify the CI's reliability, plus he felt the CI was reliable and credible through his interviews with him. The CI informed him that he had purchased methamphetamine from defendant in the past and he knew where he lived presently. The officer testified that the past buys had been a few weeks previously. He corroborated details regarding where defendant resided before the controlled buy occurred, including driving by with the CI, seeing defendant's name on the mailbox, and having previously seen defendant and his wife at the residence. He also had information from Sheriff Higgins regarding a drug investigation involving defendant. The officers also had visual surveillance of the residence during the transaction, and had audio surveillance through a recorder on the CI. Although he could not clearly see defendant when the transaction occurred, the CI confirmed that it was defendant selling the methamphetamine. The affidavit delineates details of the controlled buy with the CI that occurred at defendant's residence at approximately 10:30 p.m. on June 14, and the vehicular stop that occurred at approximately 10:20 on the same night. The stop involved a vehicle that had been observed at defendant's residence between 9:30 and 10:20 p.m. that

night. It also indicates that there were baggies of methamphetamine found in the vehicle, one of which had a distinguishing red mark on it. The driver stated they had just left defendant's residence. The affidavit also states that after seeking a second opinion from the prosecutor before securing the residence, the officers returned to the residence for that purpose. Officer Hill conducted a protective sweep, which he testified lasted 6-7 seconds, and saw a baggie that had a similar distinguishing mark in plain view. The affidavit also indicates that he saw a baggie with unknown white pills packaged in a way that is consistent with the illegal distribution of narcotics. Based on the totality of the circumstances, the Court finds that there was probable cause to support the issuance of the search warrant in this case.

Regarding defendant's assertions that the officers illegally entered his residence, it was the officers' testimony that they secured the residence and conducted the protective sweep because of their fear that evidence would be destroyed if they did not do so. In evaluating whether a warrantless entry was justified by exigent circumstances, the Court must consider the circumstances that confronted the police at the time of the entry, applying an objective standard to evaluate the reasonableness of an assertion that exigent circumstances justified a warrantless entry. United States v. Morales, 737 F.2d 761, 764 (8th Cir.1984). The Court's analysis, therefore, is not limited to the subjective beliefs of the police officer who actually made the entry. Rather, the proper inquiry is what an objectively reasonable officer on the scene could have believed. If such an officer would have had sufficient grounds to believe there was an exigency, then the Fourth Amendment does not require a warrant, and defendant's constitutional rights were not violated by a warrantless entry. See generally United States v. Knights, 534 U.S. 112, 122 (2001); United States v. Jones, 990 F.2d 405, 408 (8th Cir.1993).

In this case, the evidence establishes that there was a very limited entry into defendant's residence for purposes of a protective sweep to ensure no one else was inside, and to secure the premises while a search warrant was obtained. It is also noteworthy that the officers solicited a second opinion from the county prosecutor regarding their right to return and secure the residence. Defendant asserts that the officers illegally entered his home, and that the evidence seen in plain view should not have been included in the affidavit as a result. The officers testified, however, that their concern was the possibility of the destruction of evidence because of the fact that a drug buy had just occurred at the residence; the vehicular stop had produced methamphetamine and led to the arrest of the occupants of the vehicle; these individuals had just left defendant's house and were planning on returning; and the fact that defendant and his wife were high on methamphetamine at the time. While it is apparently true that there was no effort to flee by defendant or his wife, testimony adduced at the hearing establishes that defendant did tell his wife to run, he was very insistent on getting back into the house, and he was also very agitated. It cannot be said, therefore, that under applicable law, the officers were not justified in conducting a protective sweep of the residence. The Court agrees with the government, however, that even if the information was excised from the affidavit about a baggie with a similar mark to the one found in the vehicle being found in the residence, probable cause to support the issuance of the search warrant would still exist.

Further, based on testimony adduced at the hearing, the Court finds that there were no deliberate falsehoods that would render the search warrant invalid. It should be noted, moreover, that other than a broad assertion, defendant has identified no statements that were allegedly falsely or recklessly made by Officer Hill. The Court notes, in any event, that Officer Hill's testimony was entirely credible regarding his preparation of the affidavit, and there is no basis to conclude that the

16

information included in the affidavit was not truthful. The controlled buy and surveillance of the same would constitute corroboration of the information provided by the CI regarding having purchased methamphetamine from defendant at his residence. Based on the totality of the circumstances, the Court is satisfied that there was probable cause to support the issuance of the search warrant, and that defendant has failed to raise an issue regarding deliberately false or recklessly false statements. Therefore, the Court finds that the motion to suppress on this basis must be denied.

Even assuming, however, that the warrant in this case was not based on probable cause and found to be defective, the Court finds that the good faith exception enunciated in United States v. Leon, 468 U.S. 897, 922-23 (1984), would apply. It is clear that Officer Hill relied in good faith on what he believed to be a valid search warrant, which was reviewed and signed by a neutral magistrate. While defendant states that Judge Curless could not have been neutral because of the fact that defendant had sued him in the past, the Court finds that this assertion is not supported by the evidence. Rather, the evidence adduced at the hearing establishes that defendant was known in the community for his litigious nature regarding public officials. The testimony established that the judge, in fact, did not even remember defendant by name when he read the affidavit in support of the search warrant. It wasn't until one of the officers reminded him of who defendant was that he asked for the arrest warrant back and increased the bond amount. This occurred later in the afternoon on June 15; the search warrant had been signed by Judge Curless at approximately 1:30 a.m. Regardless of the judge's intent at that point, whether it was to make a statement or intended as a joke, there was absolutely no evidence introduced to suggest that his experience with defendant had any bearing on how he viewed the application for the search warrant. The Court finds that there

17

Case 3:07-cr-05062-ODS   Document 196   Filed 04/03/08   Page 17 of 18

is no basis to find that the issuing judge was not a neutral and detached magistrate. Further, there is nothing to suggest that the affidavit was so lacking in indicia of probable cause that the Leon good faith exception should not apply. When making a good faith assessment, the Court must examine the totality of the circumstances, including what the officer knew but did not include in his affidavit. United States v. Chambers, 987 F.2d 1331, 1335 (8th Cir. 1993). Having reviewed the record as a whole, it is clear that the officer reasonably relied on the validity of the warrant. It was objectively reasonable for the officer to have believed that probable cause existed in this case.

Although defendant also seeks suppression of statements he made to law enforcement on the basis of a Miranda violation, the Court finds that there is no basis for that motion. Rather, Officer Hill credibly testified he read defendant his rights before he spoke with him. Further, Sheriff Higgins testified that the conversations he had with defendant were unsolicited. Therefore, the Court finds that there is no evidence to indicate that a Miranda violation occurred in this case.

Accordingly, it must be recommended that defendant's Motion to Suppress be denied.

For the foregoing reasons, it will be

RECOMMENDED that defendant's Motion to Suppress be denied.

/s/ James C. England
JAMES C. ENGLAND, CHIEF
UNITED STATES MAGISTRATE JUDGE

DATE: 04/03/08

18